to the fee-sharing agreement that Mr. Padden was a party to and to remand it to back to the court with instructions to apply the fee agreement as written. There are two reasons for this. One, there was a valid fee-sharing agreement between the council in this case that met all of the requirements of Rule 1.5 of the Minnesota Rules of Professional Responsibility. And two, and perhaps more significantly, if the court doesn't enforce the fee agreement as written, there will be significant public policy concerns that will seriously upend and lead to unnecessary litigation and motion practice in all cases involving fee-sharing agreements. I want to talk about the first point, though, with respect to the fee-sharing agreement itself. Minnesota Rule of Professional Responsibility 1.5E is the controlling professional responsibility rule. We're all here to talk about it today. It's modeled after, and in fact, sets forth the requirements for a fee-sharing agreement between attorneys. You have to have three things. One, the total fee, like in any fee agreement, has to be reasonable. There is no dispute in here that that fee was reasonable. Judge Montgomery below never found that the fee was unreasonable or excessive. Two, the client has to agree to the fee-sharing agreement in writing, and the fee-sharing agreement has to be fully disclosed to the client with the prospective shares being allocated to each attorney with the work that each attorney is to perform. Again, there is no dispute in this particular case that that occurred. In fact, it occurred on multiple occasions. As the Court's aware, there were numerous iterations of counsel that were involved in this case from time to time, and at every stage of counsel's involvement when new counsel came into the case, that fee agreement, the fee-sharing agreement, was documented in writing, submitted to the clients, and the client consented. What we're really arguing about is the first prong of this 1.5 rule, which requires in a fee-sharing agreement one of two things. Either A, the division of fees has to be proportional to the services performed by the respective attorneys, or B, the attorneys to the agreement each have to assume joint responsibility for the representation. It doesn't matter which of those two standards the Court was to look at below, because the patent firm met both of them. I'll talk about it. So go ahead, on proportionality first, if you wouldn't mind. Do you agree that the Court properly has to consider whether the fee allocation in the agreement is proportional? And you're just arguing factually that it was proportional? Or do you say the Court is not allowed to examine whether the agreement matches the proportionality of the work? Sure. I think that that's an interesting question. And frankly, it's a question of first impression in Minnesota, because we don't have any controlling case in the Minnesota State Courts, whether repellent or Supremes, who have dealt with the proportionality question, nor were either of the parties to this appeal able to locate any case in the Eighth Circuit addressing the proportionality argument. Our position here is simply that, to reiterate some of the positions that you heard during the last hearing, this was a summary proceeding where the Court didn't have the benefit of a full briefing on it, didn't have the benefit of an evidentiary hearing. It was submitted on the briefs. But at the very least, here's what we know. Mr. Magnuson spoke at the last hearing just a few minutes ago about how the success of this case was due to all of the other lawyers who stayed on it. That was his words. One of those lawyers was the patent law firm. Well, hold on. Just before you go into the facts, could you answer the question whether as a legal matter, you think the District Court is permitted to re-examine or examine the proportionality and see whether it matches the agreement? I think the Court always has that power. It's inherent within the Court's authority when you're dealing with an attorney fee agreement. It has that power because it wants to uphold the public policy purposes behind the rule. All right. So you agree that the Court may do that, and so we're just fighting about whether the Court properly decided that the proportionality of the work here didn't match the 30-15 breakdown? That's one argument, but it's not the only argument. But yes, that's one. We're saying the Court got it wrong because it didn't understand the totality of patents involved. Not terribly surprising when you look at it from the perspective of a trial judge. All right. Go ahead. I just want to make sure I understood the... Well, and in fairness, here's the reason why, I think. I mean, you have the perspective as a trial court judge of seeing the case through the eyes of a trial court judge, and what do trial court judges see? They see motion practice and they see the trial. They don't necessarily see the discovery process or the expert investigation or the day-to-day interaction with the clients or the document review or the press or any of those other things. So from a trial court's perspective, it's very easy to look at this case and say, well, the White firm was the trial counsel and the Markowitz firm was the trial counsel, and they did the lion's share of the work, and the patent wasn't. It doesn't necessarily account for all the other work that the patent law firm did. And in this case, it's set forth, I think, in both of the principal briefs, so I don't necessarily want to rehash it. The work was substantial. It involved, among other things, initiating the client contact, identifying the other attorneys who could assist it in the case, so putting together the trial team, engaging the experts, identifying the fact that this was a sudden acceleration case, attending depositions. The Napoli firm in the briefing in the commanding case stated that the patent firm was present at depositions. But we know that the patent was involved at all stages of this litigation, frankly, because the client said that, and they said it repeatedly. As I read your brief, I didn't hear a proportionality argument in that. I didn't see that. I sensed that you shifted to the second prong of the first requirement of Rule 1.5e. That's a fair point, Judge. I think it comes out more in the reply brief where there was a section in there that had like a bullet point list of here's all the stuff we did to justify our existence. Is that soon enough to challenge that proportionality ruling from the district court? No, all of those were submitted to the district court in the briefings and affidavits as well. So whether the judge weighed them properly, again, that's one of the reasons we're here. No, I think the question is whether you have to raise in your opening brief on appeal any challenge to the district court's order. Oh, I— You didn't argue in your opening brief that she made a mistake on the proportionality issue. Have you— I honestly believe it was briefed in both, but let's assume that it wasn't. Let's talk about the joint responsibility argument, because if the court wants to uphold it under— uphold the district court's analysis under the proportionality of services, it doesn't change the fact that there was joint responsibility here. This is where the court's going to have to look to extra-jurisdictional cases, though, because no Minnesota case has ever talked about what constitutes joint responsibility under Rule 1.5. There are several extra-jurisdictional cases that have, whether it's the Aiello case out of New York, the Nickerson case out of Georgia, or the Scott case out of Colorado. And by the way, that's an interesting cross-section of America there. Well, on the question of joint responsibility now, there's an issue whether that was raised in the district court. Which it was, being there were two separate motions. The second motion addressed that point specifically, and that was appealed and was briefed. So I think that is properly before the court today. But with respect to the joint responsibility argument, the courts from those other jurisdictions, similar to the comment to Minnesota's Rule 1.5, have said there are two factors to evaluate when it comes to joint responsibility. The first is whether there is shared financial responsibility, i.e., vicarious liability for malpractice by co-counsel. And the second point is ethical responsibility. In other words, a duty to actively monitor the case, making efforts to ensure that co-counsel comports with the applicable ethical rules, and being available to the client to provide advice. All of those factors are met by the patent law firm in this case. First, with respect to financial responsibility, a couple of points. One, we know that the Napoli firm is involved in a malpractice suit. It is inconceivable at some point that the patent firm will not be joined to that suit, implicating its own malpractice policy, thereby sharing financial responsibility for that problem. But even if that malpractice suit hadn't been filed, the simple fact is, in the record, the documentation and fee-sharing agreement shows that the patent firm would assume responsibility for any of the fees clawed back by the Napoli firm in proportion to its fee-sharing agreement. So again, you do have shared financial responsibility here. With respect to ethical responsibility, those various other factors, such as the duty to monitor the case, we know that happened here because, again, when the issue arose with the file transfer that you heard about in the previous case, Mr. Padden was one of the attorneys who identified it and requested the file be forwarded on to the new trial counsel. With respect to being available to the clients, both Ms. Trice and Mr. Adams have repeatedly stated in letters that Mr. Padden knows the case better than anybody, and he's been our trial counsel since day one, and he continues to be our counsel. They never terminated Mr. Padden or his law firm at any point prior to the resolution of this case. He remained on all of the pleadings submitted to the court and the appeals in this case. He was counsel in this case. So from a joint responsibility perspective, he's absolutely met that element of the test. But I do think it's more important to talk about the public policy underlying it here. The reason we have Rule 1.5 and the requirement that fee-sharing agreements be in writing and that clients consent to them is to protect the client. Clients are entitled to transparency in their dealings with their lawyers. They need to know who's working on their case and how they're dividing their fees and how they're dividing the workloads. But that rule doesn't exist to give lawyers a sword to swing at each other at the end of a case. And that is exactly what's happening here. I don't want the court to mistake for a minute or lose sight for a minute of the fact that these motions had ever been brought to the district court. The recovery to the plaintiffs in the underlying case, Ms. Trice and Mr. Adams, that never would have changed. They were always getting 60% of the recovery and the lawyers were always splitting 40. So there's this idea out there that we're protecting the clients. It just doesn't exist in this particular case. This is not what we're trying to uphold. When you go into the public policy of this, let's assume that this case is affirmed. Everybody working under a contingent fee agreement is going to end up being in a situation where they're always going to be looking over their shoulder and questioning whether that's going to be challenged at some point by co-counsel. And you'll end up having a situation where the lawyers are going to be adverse essentially to each other in this case, always looking out for their own best interest and necessarily subordinating the client's best interest to make sure that they get as much of that fee generated as possible. That's not good public policy and that's not what this court should do. The bottom line is this particular attorney fee sharing agreement was negotiated by and between multiple highly skilled law firms with experience. They all consented to it. What we have right now is a situation where one firm simply doesn't like the bargain after the work that they put into the case. Your public policy argument seems to suggest that you don't really want the courts to get into this at all. And I thought in the initial part of your argument, you said no, that in Minnesota that they can do that. Well, I said that they have the right to do that. Whether they should do something, whether they can do something are two different things as people tell their children. But in this particular case, you know, if you look at the Nickerson case out of Georgia, they seem to hit the nail right on the head. And what they're talking about here is how the purpose of the rule regarding fee splitting is to protect the clients from the payment of referral fees. This wasn't a referral fee. Patent didn't just take a fee for acting as a gatekeeper and giving the work off to other clients. He actually actively was involved in the case from day one through the end. The other thing the Nickerson court said that I think is telling, and this is the role of the court, talk about how, and this is the quote, as long as both attorneys have done some work on the case beyond signing and referring the client, the courts will not engage in the cumbersome task of evaluating after the fact the relative contributions made by the bickering attorneys. That's what we have here. We have bickering attorneys fighting over a fee, none of which really affects the client. Well, I wonder when you acknowledged at the beginning that the court can do that, what's the authority in Minnesota that a court can reallocate a fee? Well, that's again, I'm giving you my answer. This is a question of first impression again in Minnesota. What's your basis? I'm telling you that I think they can because the court's ability under say like the Christensen versus Egan case. Yeah, to say it's unenforceable is contrary to public law. Right. But the difference here is that those cases, they all talk about the reasonableness of a fee. I mean, a court can invalidate a contingent fee agreement when the fee is unreasonable. Now the only case in Minnesota talking about a fee splitting agreement, I take back, there's two. I mean, Christensen versus Egan was one, and then there was the Soderberg and Vail versus the Meshbacher and Spence case. Those cases though, again, didn't concern the fee share between attorneys or the proportionality of those. They concern the procedural aspects of it. Number one, was it in writing and did the client consent? And those were the issues that really bore on those cases. So you're in the wilderness here, judges, and you've got to look outside of Minnesota for the answer to that particular question. There are at least three cases where courts outside of Minnesota have analyzed this issue and all of them have come down the side of stating, we're not in the position or it's not our job to protect lawyers from the bargains that they strike or to rewrite those bargains after they're made. And that's essentially what the court did in this case. It rewrote a contract between attorneys as to how fees should be split. It's not the role of the court to protect parties from bad bargains. It's the role of the court to protect clients from bad lawyers. And that's not what happened here. There was no need to protect the client. Did you cite that Vickers case in your brief? Which jurisdiction was it from? I thought you were just quoting it. Oh, that was Nickerson. I'm sorry. Oh, Nickerson. Yeah. Did you just cite that in your brief? I did. Nickerson is in there. How come it's not under the table of cases starting with N? Are you looking at the primary brief or the reply brief? Primary. Might be the reply brief. OK. All right. Thank you for your argument. Well, it's not in the reply brief either. Is it somebody versus Nickerson? How am I going to find it? I could take my time and find it, Your Honor. But perhaps, I don't know if he has any rebuttal time left. Well, I just, he quoted it. I thought maybe we should take another look at it. I'll give him a minute at the end to give us the citation. Go ahead, Mr. Magnuson. We'll hear from you. Thank you. May it please the court, Counsel Eric Magnuson, on behalf of Bridget Trice and Quincy Adams. The court didn't rewrite the fee agreement here. The clients did. When Mike Padden agreed to represent them, he said he'd be lead local counsel and he would walk them through the trial process. And Mike Padden pulled a disappearing act about halfway through the case. Right before trial, the Markovits firm came in because the prior lead counsel had been discharged, as you've heard. Mr. Padden never showed up at trial. He sat in the back of the courtroom when the verdict was read. He did nothing with regard to the motions prior to trial. He did nothing at trial. He did nothing on the extensive post-trial motions that were pivotal to this case. And he did absolutely nothing on the appeal. And when the Markovits firm came on board because Napoli had been fired, they said we need a new fee agreement. And we need it because, first of all, the earlier fee agreements don't talk about what's going to happen on post-trial motions and appeal. In fact, one of them specifically said this doesn't apply to that. And the clients and new counsel recognized that there was a problem with how the work had been going on in this case, who had been doing what. And so what the clients ultimately authorized in writing, and it's the clients, not the lawyers, is at the end of the day, there'll be an equitable reallocation of the fee. Now, Mr. Padden could have said, I quit. I don't want that. And under Minnesota law, he would have been able to assert a claim for the hourly time that he had put in. That's the Trenti case. He didn't do that. He waited until the case was over. And then he would not abide by the client's wishes. What are you referring to when you say the client? Is that an agreement of some kind? If you look at the last operative fee agreement, it's on Markovit stock and DeMarco letterhead. I apologize for not having the specific site. But that's the one that talks about at the end of the case, there will be an equitable apportionment of the contingent fee, the 40% contingent fee. Was that to account for the work post-trial and on appeal? Or was that? It was occasioned by what had happened up to that. But it was also to account for that additional work that was going to be done. Is that the February 2015? February 2015. Now, and Padden and White did not sign that. They didn't sign it. But under Minnesota law, only the client has to sign. Were they notified? They were notified. Your Honor, the court asked about the authority of courts in Minnesota to modify contingent fee agreements. I'll give you two cases. Thompson, which is a Minnesota Court of Appeals decision, reduced the contingent fee from $92,000 to $29,000 and says Minnesota courts have authority to review contingent fees for reasonableness and they should scrutinize them closely. The Madsen case, a wrongful death case like this. And part of this was a wrongful death case, which requires the court to make an order authorizing the distribution of the recovery. Under Minnesota law, there's a wrongful death trustee. And in this case, it was Bridget Trice. She couldn't pay out any money to anybody without court approval. So that's another reason the court got into it. But the Madsen case found that a contingent fee was excessive and not enforceable. Are these cases cited in your brief? They are, Your Honor. OK. In fact, I've got the site right here. If they're not there in the brief, I'll get them. Right. Is Minnesota fundamentally different than other states in this? We've been talking about Georgia and I even think there was a reference to Iowa. Are they different in their willingness to engage in an analysis of these contingency fees where maybe some of the states aren't? Or is that a difference that I'm? No, I think it's fair to say that Minnesota has adopted a very strong pro-client perspective on contingent fees and attorney's fees in general. You go back to the 40s, the case Lawler versus Dunn. The rule in Minnesota is that a contingent fee lawyer can be fired by their client at any time and for any reason. And it's not a breach of contract. Is that unique or relatively unusual, do you think, in the states? I think other courts have different views, which is why the Nickerson case is completely an opposite. In Georgia, the rule is if any lawyer does any bit of work, they get to split the fee. And I think it's 50-50. That's not the law in Minnesota. There has to be proportionality. In the Minnesota Supreme Court, in the Christensen case, and in the Krippner case, he has made it real clear that rule 1.5 is going to be applied by its terms. And the client gets to make the call. If you want to look at cases to survey the law outside of Minnesota, the Barra case from the Colorado Court of Appeals does a good survey of the law. You'll find it there. And then there's a case called Draglovich from the Northern District of Ohio that's cited in the briefs. That's another one that does a survey of the law. I agree with my colleague. There is no Minnesota reported appellate decision that specifically says the court can modify the fee split agreement. But what Minnesota law is absolutely clear is the client's consent to the fee split is an absolute requirement. And if the client has the right to fire the lawyer, which is undoubtedly true, lawler versus Dunn, then the client has the right to withdraw the consent to a fee agreement that looked good when it started and it went bad as the case went along. It looked fine to give Mr. Padden his 30% share of the contingent fee at the beginning of the case, but he disappeared from the case. And the client can do that at any time? At any time and for any reason? Well, if you get to that end where the case is over, then there really is. The client says, well, I think it should be allocated differently than what I agreed to. Right. And at that point in time, the client can. But the lawyer's remedy is a quantum merit claim. And he'll get the whole fee. That's, I think, a matter of Caswell from the Minnesota Court of Appeals. The client cannot renege when the work is all done. They get quantum merit for the full contingent fee. And so at a certain point in time, the client can't do the parade of horribles counsel has laid out for you simply doesn't exist. The court has to. Well, there is the risk of the attorneys constantly relitigating how much they, what proportion. There is that risk. But how do you guard against that? First of all, you have a clearly defined fee splitting agreement in the first place. And then you do what you promise you're going to do. You live up to it. That's what the problem is here. Mr. Padden didn't do it. He took a powder on this case. He basically disappeared. And Mr. White and the Markovits firm had to dig in. They had to repair the damage done by the Napoli firm. They had to go alone, basically, without Mr. Padden there. His sole contribution in this case was to try to have a press conference after the victory for his own publicity. There's a footnote in the judge's opinion where she says a cynic might say he was more interested in his own interests than the client interests. But he never showed up at any of these things. He didn't do anything. And if you're going to be lead local counsel, you'd expect you to at least show up at trial. Now, we're not saying he isn't entitled to something. He is. If he had made a quantum merit claim, he might have gotten more or less. He didn't do that. He simply said, my contract's my contract, and I get my contract. And under Minnesota law, you're not entitled to a contract measure of damages as a lawyer. You're entitled to what the rules of professional conduct authorize. Now, I think there's an interesting point here that the court has addressed my colleague on. The only argument they made in front of Judge Montgomery was proportionality. They never raised until their 59e motion this joint responsibility argument. She rejected it both on the merits and procedurally. She said, that's a whole new argument. You never made it before. But even if I looked at it, it doesn't hold water. Is that before us, then? I don't think it is. The alternative ruling in Rule 59 that's been appealed? They can't raise a new issue in a Rule 59 motion. And so if the only argument they made on appeal was the Rule 59e proportionality motion, you should say, I'm sorry, that wasn't preserved. Now, I think that really was, in their opening brief, the only argument that they made. I think I don't know that proportionality, the word may not even be in their brief, although I hate to say that categorically, because there are a lot of words in their brief. But I think it's clear they didn't. That wasn't their argument. And the proportionality argument resurrected itself in their reply brief, which is too late to raise it. And so I don't think you should decide this case based on the rules of appellate practice. You should say, if an issue's waived, it's waived. I don't think that there's any basis here for them to say that they had joint responsibility. Mr. Padden was getting paid a stipend, basically, by the Chesley firm, a monthly payment. He wasn't assuming any of the overall financial responsibility. If you look at Bridget Trice's affidavit, she'll say, he never talked to me about how the case was going. He wasn't my contact. He was supposed to be my conduit. I never heard from him. And so I don't think that there's a basis for a joint responsibility finding. This is not cutting edge Minnesota law. As we've discussed, Minnesota courts say that the rules of professional conduct have to be complied with in order for fee agreements to be enforceable. Here, the clients withdrew their consent. And when they do that, which they're entitled to, then they can consent to a new fee agreement and the lawyer can accept it or not. If the lawyer doesn't accept it, if you look at, for example, the Trenti case in Minnesota, the contingent fee lawyer got discharged. And the court said, well, you can wait and see how the case comes out and assert a quantum merit claim. Or you can come in and you can say, I've got this many hours in at this hourly rate, and I get this much. That's permissible under Minnesota law. Those alternatives were there for Mr. Padden. He didn't avail himself of them. And that happens on a regular basis? That doesn't happen on a regular basis because the lawyers in Minnesota are pretty careful about what they do. If you make a deal, you live up to it. If you say, I'm going to be lead local counsel, you act like it. If you say, I'm going to be the conduit to the client, you actually have some contact with the client. None of that happened here. Mr. Padden got the case in the door, he got some lawyers to handle it, and then he disappeared. And at the end of the day, he wants to get his full 30% contract, because if you read their brief, a contract is a contract. It's not when it comes to attorney's fees, not under Minnesota law. Judge Montgomery did the right thing by honoring the client's wishes. This was a decision by Bridget Trice and Quincy Adams that they wanted the lawyers who really got them their recovery to be appropriately rewarded. They have the right as clients to do that. And if you're going to worry about public policy, the public policy should be in recognizing the client's interests and protecting those interests. Thank you. OK, thank you for your argument. I did find the Nickerson case in the reply brief, so we're all set on that. Thank you very much. Thank you both for your arguments. The case is submitted, and the court will file an opinion.